NO. 24-10765-D

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

TOP TOBACCO, L.P., REPUBLIC TECHNOLOGIES (NA), LLC, and
REPUBLIC TOBACCO, L.P.,

*Plaintiffs-Appellees,*

v.

STAR IMPORTERS & WHOLESALERS, INC., AMIN S. HUDDA, ZIYA
BUSINESS, INC., D/B/A ZCELL & NOVELTIES, and SAMADALI LAKHANI,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Georgia
Court No. 1:19-cv-04939-MLB

---

## APPELLANTS ZCELL'S AND SAMADALI LAKHANI'S OPENING BRIEF

---

Amy K. Weber, Esq.
125 Clairemont Avenue, Suite 170
Decatur, Georgia 30030
(470) 851-9419

*Attorneys for Appellants*
Ziya Business, Inc. d/b/a ZCell &
Novelties and Samadali Lakhani

**No. 24-10765-D**

**Top Tobacco, L.P. v. Star Importers & Wholesalers, Inc.**

**Certificate of Interested Persons and
Corporate Disclosure Statement**

Ziya Business, Inc., d/b/a ZCell & Novelties and Samadali Lakhani, Defendants/Appellants in the above-styled appeal, and pursuant to Eleventh Circuit Rule 26.1-1 *et seq*. files this Certificate of Interested Persons and Corporate Disclosure Statement stating that the following is a complete list of all trial judges, attorneys, persons, association of persons, firms, partnerships or corporations having an interest in the outcome of the case or appeal:

1. Adams and Reese LLP

2. Brown, Michael L. (trial court judge)

3. Cumby, Joshua Counts

4. Gage, Rachel F.

5. Hudda, Amin S.

6. Johnson, James

7. Johnson Trial Law, LLC

8. Keeney, Amy L. Hanna

9. Lakhani, Samadali

10. Mihokovich, Donald A.

11.   Parrish, Matthew T.

12.   Partlow, Eric J.

13.   Poole, Philip T.

14.   Republic Brands, L.P. f/k/a Republic Tobacco, L.P.

15.   Republic Technologies (NA), LLC

16.   Robbins, Richard L.

17.   Robbins Alloy Belinfante Littlefield LLC

18.   Star Importers & Wholesalers, Inc.

19.   Top Tobacco, L.P.

20.   Weber, Amy K.

21.   Woodhouse, Maia T.

22.   Ziya Business, Inc., d/b/a ZCell & Novelties

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

In accord with the requirements of Eleventh Circuit Rule 28-1(C), Appellants believe oral argument would be beneficial in this case because, without clarification, district courts may continue to conclude that *Chanel, Inc. v. Italian Active Wear of Florida, Inc*., 931 F.2d 1472 (11th Cir. 1991) compels a finding of secondary infringement as a matter of law even where a company's president or chief executive offer is unaware of the purchase and sale of counterfeit goods. Nothing in *Chanel, Inc.* or its progeny dispenses with the requirement that the defendant/agent must actively and knowingly participate in the infringement. Moreover, because *Chanel* never explains the types of quantum of evidence necessary to find an individual secondarily liable for trademark infringement when the ultimate issues of willfulness and knowledge are still being litigated, the case invites district courts to do their own factfinding and reach their own factual determinations about individual liability. This is clearly the province of a jury. Oral argument is necessary to discuss in detail the problems with *Chanel*, how it was misapplied here, and how it should not be used going forward.

This matter also involves an award of significant damages levied against parties who were specifically found not to have been involved in willful infringement. The damages award bear no relationship to any metric in the case—

i

Top Tobacco's actual damages, ZCell's revenues and profits, or otherwise—and this case provides this Court with the ability to clarify the relationship between statutory damages and a plaintiff's quantum of proof of damages at trial. These are important matters deserving of fulsome, robust, and entertaining oral argument.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS......................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CONTENTS ....................................................................................ii

TABLE OF AUTHORITIES................................................................................iv

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF THE ISSUES ...........................................................................1

CONCISE STATEMENT OF THE CASE ...........................................................2

    (i)  Course of proceedings .........................................................................2

    (ii) Statement of facts...............................................................................2

    (iii) Standard of review ..............................................................................6

SUMMARY OF THE ARGUMENT ....................................................................6

ARGUMENT AND CITATIONS OF AUTHORITY ............................................7

    A.   *Chanel* and its progeny should not be read to create personal liability
        in the absence of *some* knowledge or intent.  The trial court
        committed error in holding otherwise ...................................................7

    B.   *Chanel* fails to establish a clear standard for determinations of
        secondary liability and this Court should declne to follow the case...13

    C.   The jury verdict exceeds any amount logically related to Top
        Tobacco's damages............................................................................14

        i.  ZCell's Expenses Saved and Profits Reaped .................................18

        ii.  Plaintiffs' Lost Revenues.............................................................20

        iii. The Value of Plaintiffs' Marks....................................................21

        iv. The Deterrent Effect on Others Besides the Defendant.................22

        v.  Whether ZCell's Infringement was Innocent or Willful...............23

        vi. Whether ZCell Cooperated with Plaintiffs' in Providing Records
           To Assess the Value of the Infringing Material............................25

vii. The Potential for Discouraging ZCell............................................25

viii. The Risk to Public Safety ............................................................27

CONCLUSION ...................................................................................... 28

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Anthem Industries, LLC v. Dawson*, 2017WL6996371 (NDGA 2017) ..................14

*Chanel, Inc. v. Italian Active Wear of Florida, Inc.*, 931 F.2d 1472
    (11th Cir. 1991) ..........................................................................i, 7, 9, 10, 11, 12

*City of New York v. Blue Rage, Inc.*, 2021WL4480734 (EDNY 2021) ..................17

*Coach Services, Inc. v. 777 Lucky Accessories, Inc.*, 2010 WL 2266023 at * 4
    (S.D. Fla. June 4,
    2010)…………………………………………………………………….11

*Edmondson, et al. v. Velvet Lifestyles*, LLC, 43 F.4th 1153, 1159
    (11th Cir. 2022) ........................................................................................6, 10, 13

*Las Originales Pizza, Inc. v. Batabano Group, Inc.*, 2022 WL 4369920,
    at *4-5 (S.D. Fla. July 2022) ..............................................................................13

*Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*, 2015 WL 1526177 (S.D.
Fla. April 3,
2015)……………………………………………………………………12

*Luxottica Group S.P.A. v. Casa Los Martinez Corp., et al.*,
    2015 WL 13776171, at *1-2 (S.D. Fla. 2015).............................................12, 16

*Maccabees Mut. Life Ins. Co. v. Morton*, 941 F.2d 1181, 1183 (11th Cir.1991) ......6

*Mead Johnson Co. v. Baby's Formula Service*, 402 F.2d 19, 23 (5th Cir. 1968)....11

*Nutradose Labs, LLC v. Bio Dose Pharma, LLC*, 2024 WL 92468,
    at *2, *17 (S.D. Fla. 2024) ................................................................................12

*Overseas Private Inv. Corp. v. Metropolitan Dade County*, 47 F.3d 1111, 1113
    (11th Cir. 1995)......................................................................................................6

*Rolex Watch, U.S.A., Inc. v. Bonney*, 546 F.Supp.2d 1304 (M.D. Fla.
    2008)……...11

*T-12 Entertainment, LLC v. Young Kings Enters., Inc.*, 36 F.Supp.3d 1380 (N.D.
Ga. 2014)………………………………………………………………………….11

*Tommy Hilfiger Licensing v. Goody's Family Clothing*,
   100-CV-1934-BBM, 2003 WL 22331254, at \*29 (N.D. Ga. May 9, 2003) ......27

*Top Tobacco, L.P., et al. v. Gabsons Novelties, et al.*, 2023 WL 5372541,
   at \*2 (11th Cir. 2023) .........................................................................................13

*Top Tobacco, L.P. v. Panjwani*, 2021 WL 1351443  (N.D. Ga. March 15,
2023)….8

*Volkswagen Group of America v. Varona*, 2021WL1997573(SDFL 2021) ...........15

*Wilden Pump & Eng'g Co. v. Pressed & Welded Prods. Co.,* 655 F.2d 984 (9th Cir.
   1981)…………………………………………………………………………..8

*Yarbrough v. Decatur Hous. Auth.*, 941 F.3d 1022, 1026 (11th Cir. 2019).............6

## JURISDICTIONAL STATEMENT

This appeal arises from the final judgment entered by the Northern District of Georgia in this matter on March 16, 2023, [Doc. 328] in favor of Plaintiffs-Appellees Top Tobacco, L.P., Republic Technologies (NA), LLC, and Republic Tobacco, L.P., (collectively "Top Tobacco") against Defendants-Appellants Ziya Business, Inc., D/B/A Zcell & Novelties ("Zcell"), and Samadali Lakhani ("Lakhani") (Zcell and Lakhani are sometimes referred to collectively in this brief as the "Zcell Defendants"), and the trial court's denial of ZCell Defendants' Motion for Judgment as a Matter of Law pursuant to Rule 50(b), Or In the Alternative, to Alter or Amend the Judgment Pursuant to Rule 59(e) (the "JNOV Motion") [Doc. 364].  Prior to trial, the district court granted Top Tobacco's Motion for Summary Judgment against Zcell Novelties. [Doc. 236] This court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the district court committed error when it determined, as a matter of law, that Lakhani was personally liable for violations under the Lanham Act merely because he was involved in the sale of goods he did not know were counterfeit (a fact later supported by the jury's verdict).

2.    Whether the district court committed error when it denied Zcell Defendants' JNOV Motion under Rule 50(b) to reduce the jury's award of $1,242,000 which is

grossly disproportionate to any evidence relating to damages presented to the jury at trial.

## STATEMENT OF THE CASE

**(i)  Course of proceedings.**

The district court granted Top Tobacco's request for summary judgment on liability as to Lakhani.  Following a jury trial, the district court entered a Judgment on Jury Verdict ordering and adjudging that Zcell Novelties acts of trademark infringement and counterfeiting were not committed willfully, but nevertheless awarding Top Tobacco $1,242,000.00 against the ZCell Defendants, jointly and severally. The district court denied ZCell Defendants' JNOV Motion. This appeal followed.

**(ii)  Statement of facts.**

Top Tobacco brought this action against Zcell Novelties alleging violation of the Lanham Act. [Doc. 88.]  In 2013 or 2014, Zcell Novelties purchased marijuana rolling papers bearing the TOP® and JOB® marks, Top Tobacco's marks, from a company named "Sessions" who purchased the papers from Top Tobacco. [Doc. 236, page 13-14.]  From 2017 to 2019, Zcell Novelties purchased certain TOP® and JOB® products from Third-Party Defendants Alex Seriana and his company, TN Vape. [Doc. 236, page 14.] Lakhani, as the 30(b)(6) designee for Zcell, testified that

2

TN Vape claimed it was an authorized distributor of TOP® and JOB® papers. [Doc. 236, page 15, FN12.] Alex Seriana testified that he had no reason to believe said goods he sold to Zcell Novelties were counterfeit. [Doc. 236, page 16, FN15.]

The district court granted summary judgment against Lakhani, individually, concluding that Lakhani was liable for infringement without regard to his knowledge of or willful blindness because he actively caused the infringing acts as a moving, conscious force. [Doc. 236, page 43.] The case proceeded to trial on the issues of willfulness and damages.

The evidence of ZCell's infringing conduct with respect to Plaintiffs' marks is not in dispute. From 2017 to 2019, ZCell purchased approximately $233,000 worth of Top and Job pre-priced promotional jars from TN Vape. [Trial Transcript p. 1417 ln. 22-25, ZCell Trial Exhibit 31.][1] TN Vape principal Alex Seriana was introduced to ZCell at a trade show in Las Vegas. [Trial Transcript p. 1008 ln. 12-25.] Mr. Seriana represented to ZCell that he was an authorized distributor or Plaintiffs' Top and Job branded rolling papers. [Trial Transcript p. 1011 ln. 24-25, p. 1012 ln. 1-2.] Plaintiffs did not suspect that ZCell was purchasing or selling counterfeit Top and Job rolling papers prior to March of 2018. [Trial Transcript p.

---

[1] TN Vape was a named third-party defendant in this action. ZCell settled its claims against TN Vape the week before trial. Invoices showing the exact amount of product ZCell purchased from TN Vape were admitted into evidence at trial.

3

149 ln. 2-4.] ZCell purchased the counterfeit Top and Job papers from TN Vape at or above the market prices listed in Top Tobacco's confidential product sheets (which were introduced at trial through Plaintiffs' corporate representative Sachin Lele). [Trial Transcript. P. 1392 ln. 20-25, p. 1393 ln. 1-3.] From 2017 to 2019, ZCell sold approximately $83,421.64 worth of promotional, pre-priced Top and Job jars to various wholesalers and retailers. [Trial Transcript p. 1397 ln. 3-6.][2] ZCell's trial evidence showed that it generated profits of only $8,500 on the sale of these products. [ZCell Trial Exhibit 31.] The profits were calculated by subtracting the highest price ZCell sold each product line from the lowest price ZCell paid TN vape for each product line. [*Id.*]

Top Tobacco's evidence as to its damages was speculative at best. Sachin Lele, Top Tobacco's corporate representative, was unable to quantify the value of the Top and Job brands, stating only that the brands were Top Tobacco's "crown jewels". [Trial Transcript p. 302 ln. 14-24.] Mr. Lele was unable to quantify the value of the Top and Job Brands. [Trial Transcript p. 143 ln. 24-25, p. 144 ln 1.] Indeed, Mr. Lele was unable to provide even an estimate of Top Tobacco's lost revenues or profits which resulted from ZCell's sale of the infringing goods. Mr.

---

[2] Invoices showing the exact amount of infringing products sold were introduced at trial.

Lele could not state that Top Tobacco lost any customers from bad experiences they had with products they purchased either from ZCell or from ZCell's customers. [Trial Transcript p. 301 ln. 12-25, p. 302 ln. 1-4.] In fact, Mr. Lele testified that Top Tobacco had not received a single customer complaint about the quality of the Top and Job papers purchased from ZCell or any retailers to which ZCell sold products. [Trial Transcript p. 294 ln. 6-24.] Mr. Lele was also unable to offer any testimony that the counterfeit products ZCell had sold were dangerous to the consuming public. He stated only that it was theoretically possible that the products might be harmful because the chemical composition of the counterfeit products were different than genuine Top and Job papers. [Trial Transcript p. 296 12-18]

In short. While the jury was provided with evidence of the scope of ZCell's infringing activity, including the amount of product purchased, the amount sold, and profits reaped, the jury heard almost no evidence of any actual damage suffered by Plaintiffs arising ZCell's infringing activity.

The weight of the evidence supported a finding that ZCell Defendants' infringing activity was not willful. The jury agreed and found for ZCell Defendants on this issue. Nevertheless, the jury awarded $1,242,000 in statutory damages against ZCell and Lakhani even though that the amount clearly bore no relationship to the actual damages suffered by Top Tobacco.

5

The Court entered a final judgment conforming to the jury's verdict. [Doc. 328, page 2.] Zcell Defendants timely filed their JNOV Motion to set aside the jury's damages award because the $1,242,000.00 awarded in damages award bears little relation to Top Tobaccos' purported actual damages [Doc. 364.] which the district court denied. [Doc. 376, page 9-15.]

**(iii)  Standard of review.**

This Court reviews the grant of summary judgment against Lakhani *de novo*, "applying the same legal standards used by the district court." *See Edmondson, et al. v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1159 (11th Cir. 2022) <u>citing</u> *Yarbrough v. Decatur Hous. Auth*., 941 F.3d 1022, 1026 (11th Cir. 2019). This Court reviews the district court's denial of ZCell Defendants' JNOV Motion by considering all the evidence presented at trial in the light and with all reasonable inferences most favorable to the nonmoving party. *Overseas Private Inv. Corp. v. Metropolitan Dade County*, 47 F.3d 1111, 1113 (11ᵗʰ Cir. 1995) *citing Maccabees Mut. Life Ins. Co. v. Morton*, 941 F.2d 1181, 1183 (11th Cir.1991).

## <u>SUMMARY OF THE ARGUMENT</u>

The jury found that Zcell Defendants did not willfully violate the Lanham Act. But, prior to trial, the district court ruled that Lakhani was personally liable for violations of the Lanham Act as a matter of law, regardless of whether his actions

were willful, because he "actively caused the infringing acts as a moving, conscious force." *Chanel, Inc. v. Italian Active Wear of Florida, Inc.*, 931 F.2d at 1472 (11th Cir. 1991). , concluded that despite Defendant Lakhani not knowing the goods were counterfeit, Defendant Lakhani was a "moving, conscious force" when he decided to buy and sell the infringing goods. *Chanel* is explicit that "merely selling is not enough" and there must be a "decision to engage in infringing acts" before a finding of personal liability. Therefore, the Order granting summary judgment in favor of Top Tobacco should be reversed and remanded to the district court with instructions that personal liability under the Lanham Act is a question of fact that a jury must decide.

## **ARGUMENT**

### **A. Chanel does not create automatic secondary liability for infringement in the absence of *some* knowledge or intent. The trial court committed error in holding otherwise.**

The district court found that Lakhani was personally liable for ZCell's infringement because "he was chiefly responsible for buying and selling the counterfeit rolling papers and, therefore, actively caused the infringement as a moving, conscious force." [Doc. 236, page 44.] (quoting *Chanel*, 931 F.2d at 1478). Essentially, the district court held that Lakhani was liable because he was ZCell's

7

owner and was involved in the purchase of sale of what later turned out to be counterfeit product. Notably, the district court did not evaluate evidence of Lakhani's knowledge (if any) that the papers ZCell purchased from TN Vape and later sold were fake—it believed it didn't have to. ("Eleventh Circuit law . . . does not require specific knowledge of trademark infringement as a prerequisite to individual liability.")

But it does, and *Chanel* says so (even if in a vague, oblique, and vague manner).[3] *Chanel* is replete with references to a party's knowledge of potential infringement: "If an individual actively and knowingly caused the infringement, he is personally liable" (*Chanel*, 931 F.2d at 1477); "[An] individual will be liable if he is [the] moving, active, conscious force behind infringement" (*Id.* at 1478 (quoting *Wilden Pump & Eng'g Co. v. Pressed & Welded Prods. Co.*, 655 F.2d 984, 990 (9th Cir. 1981)); "The individual liability standard [] asks whether [the defendant] actively participated as a moving force in the *decision* to engage in the infringing acts, or otherwise caused the infringement as a whole to occur" (*Id.*, n. 8) (emphasis

---

[3] ZCell Defendants are not the first people to find *Chanel* somewhat unclear. Another court in this circuit noted that "The Eleventh Circuit's language in *Chanel* creates some ambiguity about the standard for personal liability." *Top Tobacco, L.P. v. Panjwani*, 2021 WL 1351443 at *1 (N.D. Ga. Mar. 15, 2021). Interestingly, the district court in this case cited *Panjwani* as interpreting *Chanel's* holding as "owner + involvement in sale = secondary liability."

added). One cannot be a "moving, conscious force" simply by being involved in the corporate decision to buy and sell products one does not know or suspect to be counterfeit—*Chanel* tells us this. *Id*. ("merely selling the items cannot turn Greenberg into a moving, active, conscious force who caused the infringement; if it did, the entire sales force of infringing companies would be personally liable.")

*Chanel*, then, seemingly sets up a strange continuum for individual liability. One the one end is willfulness and intent to engage in trademark violations, but these are classic jury questions. *Id*. at 1476. On the other end is mere involvement in sales of infringing products, which does not create liability. *Id*. at 1478, n. 8. So how did the *Chanel* court determine that the business owner in that case was secondarily liable for trademark violations when issues of willfulness and intent remained to be tried? How did the court conclude that the owner was "a moving, active conscious force who caused the infringement"? The court did not find—as Top Tobacco, the district court, and some other Eleventh Court decisions suggest—that an owner who is involved (even inadvertently) in the sale of infringing products is automatically liable. *Chanel* makes no distinction between an owner and an employee. And if *Chanel* stands for the proposition that "owner + involvement in sale = secondary liability," it would say so in clear and unambiguous terms. Rather, without being explicit about it, the *Chanel* court engaged in its own factfinding and reached its own

9

factual conclusions about the owner's secondary liability. Not convinced? Here's how the Eleventh Circuit very recently described the reasoning in *Chanel*:

> In reaching determinations [as to the secondary liability of various parties], [the *Chanel* court] considered evidence of the individual defendants' responsibilities and actions, such as their roles and the tasks they performed for the organization. *The [court] also considered evidence of what the individual defendants knew about the infringing activity.* For example, in holding that there was a genuine dispute regarding the personal liability of defendant Greenberg, the panel noted that "he did look after the showroom when defendant Brody was out of town, and in that capacity, may have sold some of the counterfeit merchandise. The panel also acknowledged that Greenberg had introduced Brody to potential customers and ultimately sent Boridy a fax, warning him that the infringement had been discovered, and removed the infringing goods from the store.
>
> The [Chanel court] ultimately held that because merely selling the items could not turn Greenberg into a moving, active, conscious force who caused the infringement and because no evidence connected him to the purchase or promotion of the counterfeit goods, there was a genuine dispute of material fact as to his liability . . . In contrast, there was no genuine issue of material fact as to Brody's personal liability. Brody: (1) was the president and chief executive officer of the infringing corporation; (2) purchased the infringing goods; (3) *misleadingly advertised those goods*; and (4) operated the showroom where they were sold.

*Edmondson, et al. v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1164 (11th Cir. 2022) (cleaned up) (emphasis added). In *Edmonson*, this Court acknowledged that *Chanel* involves factual determinations about "what the individual defendants knew about the infringing activity," with at least one of those determinations being that Brody, the corporate owner, "misleadingly advertised" the infringing goods. *Id*. Indeed, if

Chanel stands for the simple proposition that "owner + involvement in sale = secondary liability," *Edmonson* would not have specifically pointed out that *Brody* was also involved in some suspicious activity insinuated a moving, acting, conscious decision to engage in counterfeiting.

If there's a lesson to be taken from *Chanel*, it is not "owner + involvement in sale = secondary liability." It is that there may be some set of facts allowing a district court to find secondary liability as a matter of law without ruling on the ultimate issues of willfulness and intent. Indeed, other cases applying *Chanel* to analyze the secondary liability of owners of infringing companies give great weight to evidence of actual knowledge of infringement. *See*, *e.g.*, *Coach Services, Inc. v. 777 Lucky Accessories, Inc.*, 2010 WL 2266023 at * 4 (S.D. Fla. June 4, 2010) (applying *Chanel* and engaging in defendant-by-defendant analysis of knowledge of infringement "because personal liability rests on the individual's active knowledge of the infringement"); *Rolex Watch, U.S.A., Inc. v. Bonney*, 546 F.Supp.2d 1304, 1306 (M.D. Fla. 2008) (citing *Chanel* for the proposition that "[a]n individual may be personally liable for trademark infringement only if he actively and knowingly caused the infringement") (cleaned up); *T-12 Entertainment, LLC v. Young Kings Enters., Inc.*, 36 F.Supp.3d 1380, 1394 (N.D. Ga. 2014) (citing *Chanel* for the proposition that "individuals are personally liable (i.e., jointly and severally with the

11

corporation) only where they actively and knowingly caused the trademark infringement"); *Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*, 2015 WL 1526177 at * 4 (S.D. Fla. April 3, 2015) (citing *Chanel* to hold that a complaint must allege that individual "actively and knowingly caused the infringement" in order to state a claim for secondary liability)

At Top Tobacco's urging, the district court read *Chanel* to require only a showing of "owner + involvement in sale" to find Lakhani liable for secondary trademark violations. This was error. The district court did not analyze "what [Lakhani] knew about the infringing activity," or whether he "misleadingly advertised" the rolling papers at issue or demonstrated some other evidence of an active or conscious decision to take part in trademark infringement. *Edmonson*, 43 F.4th at 1164. Because the district court did not apply the specific factfinding seemingly required by *Chanel*—and did not specifically point to facts (other than ownership of ZCell and involvement in the purchase and sale of goods) showing Lakhani's active, conscious decision to infringe on Top Tobacco's marks, its grant of summary judgment to Top Tobacco was improper.

**B.** ***Chanel* fails to establish a clear standard for determinations of secondary liability and this Court should decline to follow the case.**

As noted above, *Chanel* purports to allow a district court to find an individual secondarily liable for a company's trademark infringement without ruling on the ultimate issues of willfulness and intent. But the standard Chanel invokes to support such a finding of secondary liability—"whether [the defendant] actively participated as a moving force in the *decision* to engage in the infringing acts, or otherwise caused the infringement as a whole to occur"—is impossibly vague. *Chanel*, 931 F.2d at 1478 n. 8. What does it mean to "actively participate as a moving force in the decision to engage in the infringing acts"? *Chanel* doesn't answer this question (other than to say that merely being involved in the sale of infringing goods isn't sufficient). *Id*. As Edmonson admits, the vague *Chanel* test requires a district court to "consider evidence of what the individual defendants knew about the infringing activity." *Edmondson,* 43 F.4th at 1164. But it doesn't give district courts any guidance as to the types of evidence to be considered or the quantum of evidence necessary to make an individual secondarily liable. The test is confusing and allows district courts to reach their own determinations as to the weight and sufficiency of evidence. This is the role of the jury. Indeed, allowing a district court to apply the *Chanel* test in the absence of clear, irrefutable evidence of willfulness and

13

knowledge leads to anomalous results like the one here—Lakhani is liable for a seven-figure judgment when a jury found that he (and ZCell) did not willfully engage in trademark violations. Chanel should be scrapped and, to the extent this Court determines that a district court should be allowed to find secondary liability while the ultimate issues of wilfullness and knowledge are still being litigated, it should lay out a clear, unambiguous explanation of types of evidence to be considered or the quantum of evidence necessary to make an individual secondarily liable.

## C.   The jury verdict exceeds any amount logically related to Top Tobacco's damages.

The jury's statutory damages award far exceeds federal Lanham Act cases both in the Eleventh Circuit and in other federal circuits. A large majority of these cases involve default judgments obtained against counterfeiters. Most of these cases involve willful infringement on the part of the defendants, higher profits, and significantly worse facts that ZCell's case.

One such example of a default case is *Anthem Industries, LLC v. Dawson*, 2017WL6996371 (N.D. Ga 2017). In that case, the Plaintiff owned a trademark for a tumbler mug handle which it sold on Amazon. The Defendant operated an Amazon store and diverted the Plaintiff's customers away by selling an identical item and advertising its products by using the Plaintiff's stock images. The Plaintiff was able

14

to show that its monthly revenue for its sales of the product at issue averaged $144,490 per month. Prior to filing suit, the plaintiff made two written demands to the Defendant to stop selling the infringing goods. The defendant continued to sell the items and never responded to the Plaintiff's demands. In that case, the district court awarded $500,000 in statutory damages under the Lanham Act, finding that the defendant had willfully infringed on the plaintiff's trademarks, ignored multiple cease-and desist demands, and that the plaintiff had demonstrated a drop in its sales of the item after the Defendant began selling the counterfeit products.

Outside of the Northern District of Georgia, the Federal District Court for the Southern District of Florida addressed the issue of awarding statutory damages under the Lanham Act in *Volkswagen Group of America v. Varona*, 2021WL1997573(SDFL 2021). The *Varona* case is particularly instructive because it involves a relatively rare instance where statutory damages were awarded following a lengthy and fact intensive trial (albeit a bench trial). In that case, the defendant operated an eBay store named oemwheelsdirect, where it advertised for sale what it claimed were original equipment manufacturer Audi wheel sets which it sold for $1,577 per set. Volkswagen became aware of the defendant's eBay store some time in 2019 and made a test purchase of a set of what the defendant claimed to be authentic, brand new, made in Germany Audi OEM Wheels. Upon a visual

15

inspection, Plaintiff discovered that the wheels were in fact counterfeit. In discovery, the Defendant claimed to have no records for its sales of the counterfeit wheels. Through third party discovery the Plaintiff obtained records from the Defendant's PayPal account which showed revenues of at least $5 million in a two-year period. From that, they were able to show that the Defendant had made at least $40,000 in profits from its sale of the counterfeit goods. The Court noted that the Defendant made numerous false statements under oath throughout the litigation regarding its financial records and its involvement in the counterfeiting operation. The Defendant's willful infringement was stipulated to before the trial.

The district exhaustively analyzed the seven factors set forth in *Luxottica Grp. S.p.A. v. Casa Los Martinez Corp.,* No. 1:14-CV-22859-JAL, 2014 WL 4948632, at *4 (S.D. Fla. Oct. 2, 2014) which included:  (1) the expenses saved and profits reaped; (2) the revenue lost by the plaintiff; (3) the value of the copyright [or trademark]; (4) the deterrent effect of others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.[4] In analyzing these

---

[4] Note that these are the same factors provided to the jury in the district court's instructions in the instant case.

factors, the district court found that while the plaintiffs were able to estimate Defendants profits, the actual number of infringing sales could never be known due to the Defendant's lack of candor in the discovery process. The district court also ruled that the strength and value of the Audi marks were extremely high, that there was a substantial need for deterrence and punishment, and that the counterfeit wheels, given the nature of the product posed a serious safety risk. In light of all of this, the district awarded statutory damages to the Plaintiff for $609,227.10 broken down as follows: profits of $40,615.14 trebled for willfulness (totaling $243,690.84) increased by 25% to account for the value of the Audi brand totaling $304,613.55 per mark multiplied by two.

These three illustrative cases demonstrate a common theme. While the Lanham Act allows statutory damages which greatly exceed a defendant infringer's profits, district courts rely heavily on a defendant infringer's profits in calculating an award of damages. This is consistent with the purpose of the statutory damages provision in the Lanham Act. When one consults the legislative history of the Act, one sees that the purpose of statutory damages is not for plaintiffs to obtain inflated damages awards when a defendant infringer's activity is relatively minimal, rather, it is to provide a plaintiff with the ability to collect when a defendant is uncooperative. Reading from the legislative history, the Senate wrote:

> "The committee recognizes that under current law, a civil litigant may not be able to prove actual damages if a sophisticated, large-scale counterfeiter has hidden or destroyed information about his counterfeiting. Moreover, counterfeiters' records are frequently nonexistent, inadequate or deceptively kept in order to willfully deflate the level of counterfeiting activity actually engaged in, making proving actual damages in these cases extremely difficult if not impossible. Enabling trademark owners to elect statutory damages is both necessary and appropriate in light of the deception routinely practiced by counterfeiters. The amounts are appropriate given the extent of damage done to business goodwill by infringement of trademarks."

S. Rep. 104-177 V Section 7.

Where however, a Defendant infringer is forthright and cooperative, a plaintiff cannot, and should not be able to recover substantially more than it was damaged simply because the statute may allow it. This brings us now to the present case. It is undeniable that, based on the factors the jury was instructed to follow and the foregoing case law, the jury's statutory damages award was facially excessive. ZCell Defendants address each of these factors in turn.

### i.    ZCell's Expenses Saved and Profits Reaped

This factor weighs heavily in favor of ZCell's request for judgment as a matter of law. One of ZCell's core arguments in defeating Top Tobacco's claim that it willfully infringed on the Top and Job marks was the price ZCell paid for the products at issue. Based on Top Tobacco's own confidential product fact sheets,

ZCell purchased the Job Orange, Job 1.25, Job 1.5 and Top jars from TN Vape at or above Top Tobacco's list price. [Trial Exhibits Plaintiffs' 27, 28] As ZCell argued (and Top Tobacco agreed), price is one of the more important factors a purchaser of goods can look to in determining if the items are genuine or not. At trial ZCell used an analogy of Rolex watches, which normally sell for tens of thousands of dollars being sold in Times Square for a couple hundred dollars. A purchaser of a $200 Rolex watch should be dubious of its authenticity, where a purchaser of a $10,000 Rolex watch can be confident that the product is genuine. ZCell's lack of savings translated to low profit margins when it sold the infringing products between 2017 and 2019. ZCell's undisputed profits calculation at trial showed that it made no more than approximately $8,500 in profits selling the Top and Job papers to its various customers. [Defendant's Trial Exhibit 31] Plaintiffs made no effort to dispute this figure.

Where the *Dawson* and *Varona* district courts all used the infringing defendants' profits as benchmarks for calculating and justifying their statutory damages awards, the jury in this case clearly did not. The minimum statutory damages the jury could have awarded to Plaintiff for ZCell's infringement was $9,000. This would have been only $500 more than ZCell's undisputed profit calculation. What the jury did instead was take ZCell's undisputed profit calculation,

and multiply it by <u>one hundred and forty six times</u> even after finding that ZCell's infringement was innocent. This is plainly unjust.

### ii.    Plaintiffs' Lost Revenues

This factor also weighs heavily in ZCell's favor. Plaintiffs offered no evidence whatsoever of any lost revenues that experienced as a result of ZCell's infringement. Plaintiffs' corporate representative Sachin Lele gave a halfhearted attempt to justify the $18 Million his company asked the Jury to award by speculating that customers <u>could</u> have had poor smoking experiences with the counterfeit items ZCell sold. [Trial Transcript p. 301 ln. 12-25] He was however unable to provide a single instance of an instance where a customer complained about an inferior product they purchased which could be tied to ZCell. [Trial Transcript p. 294 ln. 6-24] Instead, he waxed poetically about how counterfeiting hurts everyone and there was no way to know the impact counterfeiting actually had on Plaintiffs' business. [Trial Transcript p. 301 ln. 12-25, p. 302 ln. 1-4] While the latter part may be true, there is at least one way Plaintiffs might have been able to quantify their lost revenues. They could have argued that any inauthentic Top and Job marked products that ZCell sold are revenues that Plaintiffs in some way might have expected to recover. Mr. Lele likely did not make this point because it would justify a rather diminimus award. The invoices ZCell produced showed that ZCell sold approximately $83,421.64

20

worth of the promotional, pre-priced Top and Job jars to various wholesalers and retailers over a roughly two-year span. [Trial Transcript p. 1397 ln. 3-6] The Jury appeared not to give this number any real weight at all. Instead, the jury awarded more than <u>sixteen times</u> ZCell's gross revenue in Statutory damages. Again, the number the jury ultimately reached bore absolutely no relationship to what Plaintiffs might have reasonably calculated as the revenue they lost as a result of ZCell's sale of the counterfeit goods.

### iii.    The Value of Plaintiffs' Marks

ZCell does not dispute that the Top and Job marks are valuable. ZCell believes Plaintiffs when they say the brands are Plaintiff's "crown jewels". That being the case, the <u>Varona</u> ruling is again, instructive. Recall that in that case, the brand at issue was Audi. ZCell means no disrespect to Plaintiffs when it says that the Audi brand is obviously significantly more valuable than the Top and Job brands. While tobacco use has steadily declined over the years as more and more people are now aware of its detrimental effects, Audi is a brand known by car enthusiasts and non-car enthusiasts alike. Recall in <u>Varona</u> the Court recognized the value of that brand, and added a 25% multiplier to its damages calculation, after trebling the Defendant's profits for willfulness. Even if ZCell's profits were trebled (which would not be justified because ZCell's infringement was innocent) and multiplied by 25%, that

would only equal $31,875. The jury's award in this case was almost <u>thirty-nine times</u> that amount. While a multiplier might be justified for the value of Plaintiff's brand, it certainly does not justify the excessive amount that was awarded in this case.

### iv.    The Deterrent Effect on Others Besides the Defendant

Sachin Lele testified that counterfeiting is an ongoing issue for Plaintiffs. There was no evidence presented at trial that this lawsuit, or other similar lawsuits against innocent infringers will have any deterrent effect on the wholesaling market as a whole. Plaintiffs put forth no evidence that it has seen a marked drop in counterfeiting because of its litigation efforts against ZCell. Moreover, what message exactly does this jury award send? Even if you have no idea that you are buying and selling counterfeit goods, you will still be forced to pay over a million dollars to multinational corporate plaintiffs for daring to carry their products? The evidence presented at trial shows that ZCell is very close to the bottom of the supply chain for these products. Nothing about this verdict will do anything to deter, for example, TN Vape, the company who sold these items to ZCell.[5] Nothing about this

---

[5] It is worth mentioning that Plaintiffs did file suit against TN Vape for its role in this case. Well before trial, Plaintiffs settled with TN Vape for less than $100,000 in order to get TN Vape to turn against ZCell. Plaintiffs obtained a declaration from Mr. Seriana which stated that ZCell was aware the infringing items were fake. He then recanted during his deposition, where it was apparent that he had no idea what he had signed. Plaintiffs chose not to call him in their case against ZCell.

verdict will do anything to deter the people who sold TN Vape the counterfeit products, wherever they came from. The general deterrence aspect of this award is minimal given ZCell's market position.

### v.    Whether ZCell's Infringement was Innocent or Willful

ZCell's innocence in this case is the probably the single most important reason why the should have—but did not—grant ZCell's JNOV Motion. The jury's award is manifestly unjust. The evidence of ZCell's innocence is overwhelming. ZCell was introduced to TN Vape's principal, Alex Seriana, at a trade show in Las Vegas. Samad Lakhani testified that the particular trade show where he met Mr. Seriana is reserved only for people who own wholesaling businesses or who own the types of businesses who purchase product from wholesalers. [Trial Transcript p. 1019 ln. 8-12] He testified that it is routine for people to build business relationships at these events. [Trial Transcript p. 1019 ln. 13-18] It was undisputed that Mr. Seriana told Mr. Lakhani that he was an authorized distributor of Top and Job products. Mr. Lakhani had no reason not to take him at his word despite Plaintiffs' bald assertions to the contrary. After being introduced to Mr. Seriana, ZCell purchased Top and Job products from him at or above Plaintiffs' prices. [Trial Exhibits Plaintiffs' 27, 28] Even after Plaintiffs became aware that ZCell was selling counterfeit product through its first test buys, Plaintiffs made no effort to contact ZCell. They never sent

a cease-and-desist letter. They never contacted ZCell to put them on notice that they might have more counterfeit product in stock. Neither ZCell nor Mr. Lakhani had any idea the items were counterfeit until after the DeKalb County police raid of ZCell's warehouse.

This is important because it should take completely off the table the idea that the statutory damages award should serve some sort of punitive purpose. It is common sense that the American justice system should not punish innocent people. It is a core principal of justice that we do not punish those who have done nothing wrong. The Jury's finding that ZCell did not willfully infringe on Plaintiff's trademarks makes their award all the more puzzling. Their award of $138,000 per mark is more than two-thirds the statutory maximum. This is manifestly unjust, and clearly demonstrates the excessiveness of their award.

### vi.    Whether ZCell Cooperated with Plaintiffs in Providing Records To Assess the Value of the Infringing Material

Plaintiffs did not argue before or at trial that ZCell provided incomplete records to assist Plaintiffs in assessing the value of the infringing material ZCell bought and sold. In fact, the opposite is true. ZCell was forthright in discovery, telling Plaintiffs not only from whom ZCell purchased Top and Job papers in the relevant time frames, but also how much they paid, to whom they sold it, and how

much they charged. ZCell did not stop at that. ZCell provided its business tax returns and gave Plaintiffs everything they requested. ZCell continued providing records to Plaintiffs even after this case was filed for any Top and Job products they subsequently purchased. Unlike in <u>Varona</u> where the Defendant withheld financial information and made numerous false representations to the Court, thus requiring the Plaintiff to seek third party financial records, ZCell had an open-door policy with Plaintiffs throughout the pendency of this litigation. Looking back to the Lanham Acts' legislative history, recall that the purpose of Statutory Damages is to allow Plaintiffs to recover damages where Defendants refuse to be forthright in turning over important documentation in order to conceal their wrongdoing. While ZCell recognizes Plaintiffs' right under the Lanham Act to seek statutory damages, it should not give Top Tobacco *carte blanche* to recover an unjust award, given the facts if this particular case.

### vii.    The Potential for Discouraging ZCell

This factor should have been given no weight in assessing damages. As discussed above, it is undisputed that ZCell was an innocent actor in its infringing activity. How is it just to hand down an excessive judgment against an innocent company for the purpose of preventing them from innocently infringing on another's mark? It simply does not make sense. The damages award here is not deterrent. It is

punitive. One should not be punished severely when one has done nothing wrong. This factor again weighs heavily in ZCell's favor.

### viii.    The Risk to Public Safety

Plaintiffs offered no concrete evidence that the infringing products ZCell sold pose a risk to public safety. Sachin Lele testified that Plaintiffs' rolling paper products are evaluated by the FDA but could not provide any evidence that the products ZCell sold contain any harmful ingredients. [Trial Transcript p. 296 12-18] There is no evidence that the counterfeit products pose any more of a health risk than the actual products Plaintiffs' itself sells, which are papers designed for people to smoke toxic substances. This alone, or in conjunction with the factors outlined above, does not justify the jury's excessive award.

*** 

As a final point, in addition to the factors outlined above, the jury seemed to ignore the instruction that immediately followed these seven factors. The jury was instructed that the award of statutory damages "should not constitute a windfall for the Plaintiff and should bear some relationship to the actual damages suffered by Plaintiff." *See e.g. Tommy Hilfiger Licensing v. Goody's Family Clothing,* 100-CV-1934-BBM, 2003 WL 22331254, at *29 (N.D. Ga. May 9, 2003) (district court

finding full amount of statutory damages allowable under the Lanham Act would serve as an unjust windfall to the plaintiff). This award undoubtedly constitutes a windfall for the Top Tobacco. There is no dispute that ZCell purchased approximately $233,000 of the infringing products from TN Vape, sold approximately $83,421.64 of them, and profited no more than $8,500. The remaining products were seized by DeKalb County and were subsequently destroyed. Because of this, Top Tobacco was awarded $1,242,000: **FIVE TIMES** the total amount of purportedly counterfeit product ZCell purchased from TN Vape, approximately **SIXTEEN TIMES** ZCell's total revenue from its sales of the purportedly counterfeit product, and approximately **ONE-HUNDRED AND FORTY-SIX TIMES** ZCell's total profit from its sales of the purportedly counterfeit product. Each of these multipliers represents a significant windfall for Plaintiff. There is simply no world where   $1,242,000 represents anything close to Plaintiffs' actual damages, if Plaintiffs suffered any actual damage at all. The jury appeared to ignore this instruction. The Court should therefore issue an order reducing the jury's statutory damages award to conform with the body of law cited above, and the instructions the jury was given.

## **CONCLUSION**

For the reasons set forth above, the Zcell Defendants respectfully request that this Court: (a) reverse the summary judgment finding that Lakhani is individually liable for ZCell's trademark infringement; and (b) reverse the district court's denial of ZCell Defendants' JNOV Motion and remand the case for determination of the proper amount of damages warranted under the facts of the case.

Dated: May 22, 2024.

Respectfully submitted,

*/s/ Amy K. Weber*
Amy K. Weber
JOHNSON TRIAL LAW, LLC
125 Clairemont Avenue, Suite 170
Decatur, Georgia 30030
Tel: (470) 851-9149
james@johnsontrial.com
amy@johnsontrial.com

*Counsel for Defendants/Appellants Ziya Business, Inc. D/B/A Zell & Novelties and Samadali Lakhani*

## **CERTIFICATE OF COMPLIANCE**

This document complies with Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 6,447 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman in 14-point.

*/s/ Amy K. Weber*
Amy K. Weber

*Counsel for Defendants/Appellants Ziya Business, Inc. D/B/A Zell & Novelties and Samadali Lakhani*

Dated: May 22, 2024

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of May 2024, I electronically filed the foregoing Defendants-Appellants Ziya Business, Inc. D/B/A Zell & Novelties and Samadali Lakhani's APPELLANTS OPENING BRIEF with the Clerk of the Court and a true and correct copy was served on all counsel of record who are registered to use the CM/ECF system and receive service by the CM/ECF generated Notice of Docket Activity.

*/s/ Amy K. Weber*
Amy K. Weber

*Counsel for Defendants/Appellants Ziya Business, Inc. D/B/A Zell & Novelties and Samadali Lakhani*

Dated: May 22, 2024